IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZEM ZEM SHRINERS, Plaintiff )
)
v. ) CIVIL ACTION NO. 05-57 ERIE
)
PATRICK H. SCHWINDT, Defendant )

HEARING ON DEFENDANT'S MOTION TO QUASH AND/OR MODIFY SUBPOENAS

Proceedings held before the HONORABLE SEAN J. McLAUGHLIN, U.S. District Judge, in Courtroom C, U.S. Courthouse, Erie, Pennsylvania, on Monday, June 27, 2005.

APPEARANCES:

RICHARD A. LANZILLO, Esquire, appearing on behalf of the Plaintiff.

PHILIP B. FRIEDMAN, Esquire, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

P R O C E E D I N G S

(Whereupon, the proceedings began at 9:00 a.m., on Monday, June 27, 2005, in Courtroom C.)

THE COURT: We have a motion to quash and/or modify subpoenas today.

MR. FRIEDMAN: That is correct, your Honor. The plaintiff has filed numerous subpoenas in this case requesting every conceivable financial document they could think of regarding Mr. Schwindt going all the way back to 1993. As the court will recall, they have made allegations of misappropriation, either by establishing procedures that were not fully effective or by outright embezzlement. They haven't specified what it was, how it was done or even what was taken, other than some guesstimates because of a decrease in the amount of income. It is our position that to go back and subpoena financial records of this voluminous nature covering every aspect of an individual's life, is not only not fair but it's not relevant to those proceedings.

THE COURT: Isn't his point, to steal a phrase "follow the money", isn't he trying to -- the theory is, the allegation is that the defendant over a period of several years embezzled money from the plaintiff and largely in cash. He wants to look, take a picture of his financial health before he

allegedly became involved in that activity, while he was engaged allegedly in this activity, and then a short period of time after he was allegedly no longer engaged in that activity to see if there's a spike in his assets. That's what I understand -- that's how it purports to be relevant.

MR. FRIEDMAN: That is sort of what his allegation is. But what they are doing is requesting not only the deposits and I don't know, they're requesting every document, every financial record.

THE COURT: It appears they're requesting just about everything.

MR. FRIEDMAN: Including mortgages, IRAs, checks they've written, personal matters, political contributions, charitable contributions.

THE COURT: I don't know if you would know this. But throughout the relevant time period, when I say the relevant time period, I'm talking about the time period that forms the subject matter of the subpoena, '93 to '05, I think, was he married throughout that period of time?

MR. FRIEDMAN: He was.

THE COURT: Do you know if his wife worked throughout that period of time?

MR. FRIEDMAN: I don't know if she worked that entire period of time, I know she has worked.

THE COURT: She would be filing, be on an income tax

return -- at least for some years she would have been reporting her own income?

MR. FRIEDMAN: That's correct, your Honor.

THE COURT: All right. So, basically, as set forth in the motion, as articulated by you, it's overly broad, it's too long a time period, it's irrelevant and it sweeps up the wife as well?

MR. FRIEDMAN: Exactly. You know, your Honor, as we suggested during our first set of arguments, I don't believe this court has jurisdiction in this matter. I requested that discovery initially be limited to the jurisdictional issue, the court denied that. But we're now into the huge, voluminous task of uncovering every aspect of these persons' lives. If this court indeed does not have jurisdiction, it would seem to me it's extremely unfair to order this type of production.

THE COURT: Even if it should come to pass on a further motion or whatever that I decide that I don't have jurisdiction, some other court would.

MR. FRIEDMAN: Possibly that is something we would have to deal with potentially.

THE COURT: They would have the same thing before them.

MR. FRIEDMAN: They may or may not.

THE COURT: Obviously, one of the concerns here is the sensitive nature, personal nature of the information.

Aren't there adequate means, and it happens all the time, by way of protective orders and that type of thing, to ensure that that information is not disseminated further, anything further is absolutely necessary?

MR. FRIEDMAN: That's part of our position. We made that request as well. They have also, according to the information we have, they have contacted the Internal Revenue Service and have gotten agents involved.

THE COURT: The Zem Zem people?

MR. FRIEDMAN: Yes. We believe in part that these documents are being sought for purposes of handing them over to the Internal Revenue Service. It does not seem to be an appropriate use.

THE COURT: The Internal Revenue Service presumably would already have a lot of documents, wouldn't they, tax returns?

MR. FRIEDMAN: Tax returns. They don't have all of these other documents. The only way they're going to obtain them is if they go through a lengthy process. Any documents disclosed in this case ought to be done pursuant to a protective order.

THE COURT: All right. Let me hear what Mr. Lanzillo has to say.

MR. FRIEDMAN: Thank you, your Honor.

MR. LANZILLO: Your Honor accurately characterized

our objective here as an attempt to follow the money. In terms of our alleged effort to embark on a fishing expedition, judge, I mean here's what we know so far. We know that immediately after Mr. Schwindt was forced out as our bingo manager at Zem Zem, that revenue spiked up about fourfold from the bingo operation. We've been able to identify a number of suspicious transfers of moneys to both Mr. Schwindt and to an associate of Mr. Schwindt, a Dick Post, who was found dead under a train trestle several months ago.

THE COURT: Who's Dick Post?

MR. LANZILLO: He was --

THE COURT: I should say who was Dick Post?

MR. LANZILLO: Mr. Post was one of two of the most common signatures you'll find on checks coming out of the bingo account at Zem Zem. He was associated with the bingo operations with Mr. Schwindt. And he's no longer available, obviously, because through some undetermined means he ended up dead under a train trestle.

THE COURT: Where?

MR. LANZILLO: Out in Girard.

THE COURT: Was it ever ruled on -- did he jump, was it suicide, was it foul play, what did they say?

MR. LANZILLO: The coroner delayed for a long period of time in making a ruling, I think his ruling was accidental. Although, the circumstances remain unclear. But getting back

to my point here, your Honor. While we've been able to identify some suspicious transfers already, most of this money was taken in cash. It was Mr. Schwindt who exercised almost dictatorial control of, almost dictatorial control of the operations of the bingo. In order to get all the details here, we need to do a comparison of what Mr. Schwindt was deriving from his -- relative to his employment as a part owner of a landscape business. We're aware that his wife also had employment and that her income, from what we can tell, was not substantial.

THE COURT: Why do you care about her income?

MR. LANZILLO: It's joint.

THE COURT: It's a joint return. If you already know, if you don't know the dollar value, you know whatever she was making was relatively insignificant, is that right?

MR. LANZILLO: In fairness to Mrs. Schwindt --

THE COURT: Why couldn't you just black that out -- do you really care about her portion of the return?

MR. LANZILLO: This is a joint account. We can't look at the whole picture without her. We certainly would agree to a stipulated protective order. I've got them on my system, we're not interested in providing information to anyone else.

THE COURT: What about Mr. Friedman's point, I'm not even sure what the implications of this are, you get the

returns, the records and you turn them over to the IRS -- is there an active IRS investigation going on, do you know, Mr. Friedman?

MR. FRIEDMAN: It's my understanding there is.

MR. LANZILLO: I don't know nothing about that. I'll represent to the court I have had no contact with the IRS, I cannot speak on behalf of others at Zem Zem. But that has not been my focus. I would be happy to put into a stipulated protective order that we would not produce documents to any third party absent lawful subpoena to us, which, obviously, Mr. Friedman could then challenge in that proceeding. That's not what this is about. We just simply can't get a picture here of the transactions without the information. I intentionally chose a period of time, your Honor, that I thought was very reasonable. It's really two years prior to when Mr. Schwindt took over.

THE COURT: How was he employed before he became employed as bingo manager?

MR. LANZILLO: My understanding is he has always been with a business known as Schwindt Brothers, which is operating now as a landscape service. We investigated that matter, I see Mr. Schwindt apparently had some other business interests in Arizona and other locations. We believe that those entities, including Schwindt Brothers, were receiving laundered or used the laundered money from Zem Zem. Which is

something we'll have to get into as well. But this is going to be a question of following the money trail. It's not going to be particularly easy. There was very tight control by Mr. Schwindt over the bingo. It is remarkable to me that a number of people who spent time with Mr. Schwindt at his property in Arizona. There are very few people in the inner circle, I don't know where this investigation is going to take us, but very few people are in the inner circle, not very close to Mr. Schwindt. And, apparently, were entertained by him in Arizona. And it's not going to be a particularly easy task to pierce through what is involved --

THE COURT: Who's in the inner circle?

MR. LANZILLO: Well, there are other members of the club. I mean, the whole circumstance is odd. We've got an accounting auditor --

THE COURT: Michael Moore?

MR. LANZILLO: Yes, he was the auditor for Zem Zem at the time he was the accountant for Mr. Schwindt.

THE COURT: Are you suggesting that these people, like the CPA, were conspiratorially involved?

MR. LANZILLO: At this point I'm not suggesting anything. I do not know, this is going to require a great deal of effort. It's going to require a forensic accountant. I can't necessarily count on a lot of individuals to be anxious to be forthcoming with information.

THE COURT: Of course, there's no reason you would not be aware of -- you're not aware of what Mr. Friedman says he's aware of, that is --

MR. LANZILLO: An IRS investigation?

THE COURT: IRS criminal investigation, is that your understanding or you don't know?

MR. FRIEDMAN: We don't know for sure.

THE COURT: What's the source of that?

MR. FRIEDMAN: Zem Zem brought in Harry Anderson, the court's very familiar with Mr. Anderson, our understanding is Mr. Anderson had contact with people in the IRS office.

THE COURT: All right. With respect to Northwest Savings Bank, Marquette Savings Bank, PNC, have their counsel been in touch with you, did they express an opinion as to -- did you serve the subpoenas on them --

MR. LANZILLO: I served them. I've gotten no reluctance or indication from the recipients of the subpoenas that they have any qualms about producing the documents. They're aware of the motion to quash. And in most cases they're awaiting the court's ruling on those. In one instance, I believe it was Marquette -- actually produced documents before the motion to quash was filed. No one has expressed an objection or a concern regarding the scope of the subpoenas. No one has indicated they are unduly burdensome. Judge, I should note one thing with respect to your last question. I

understand that Mr. Moore, the auditor, had compiled the documents, was ready to produce them to us when Mr. Schwindt intercepted the records. I'm not sure Mr. Moore actually retained copies of what was intercepted.

THE COURT: What do you mean intercepted?

MR. LANZILLO: We actually got a call from Mr. Moore's office that the documents were ready. We dispatched a runner to go get them. When the runner arrived, the documents had been picked up on behalf of Mr. Schwindt.

THE COURT: By who?

MR. LANZILLO: I assume Mr. Friedman's office, I don't know. The indication given to my runner, those were the documents. So they now apparently may be in the possession or control of Mr. Schwindt or counsel.

THE COURT: Do you have them?

MR. FRIEDMAN: The only documents we have, your Honor, is the tax returns from Mr. Moore. We just have copies of tax returns, I don't know what you're referring to.

MR. LANZILLO: We received a call indicating that Mr. Moore had the documents ready for production.

THE COURT: What documents did you request from Mr. Moore?

MR. LANZILLO: They're in the subpoena, but it was documents beyond --

THE COURT: I see it, all right.

MR. LANZILLO: Documents beyond tax returns, your Honor.

THE COURT: Well, that's something that will just have to get shaken out one way or the other. Let's now go to the practical side of this. And you can sit down. Mr. Friedman, in your papers alternatively you request at the end there be some type of -- that if the information is ordered to be disclosed, it be subject to a protective order, to prohibit disclosure to any and all third parties. Is there anything beyond that that you are looking for specifically or what?

MR. FRIEDMAN: In terms of a protective order?

THE COURT: Right.

MR. FRIEDMAN: The only matters are what we argued already, statute of limitations, not going back to 1993, the statute of limitations is five years on this case. Even to go back to 1995 seems to me to be well beyond the statute.

THE COURT: He wouldn't be suing for conduct in '93 but using evidentiary support, I gather, for the conduct that forms the subject matter. But you're quite right, that conduct arguably would be time-barred. But let me get an order on the record here and then we'll take it from there. This is an order.

ORDER

Presently pending before the court is a motion to quash and/or modify subpoenas. In the interest of brevity,

I simply incorporate by reference the individual subpoenas attached to the defendant's motion.

As set forth in the plaintiff's response and as developed more fully at oral argument, plaintiff seeks various financially-related documents relative to the defendant and his wife from various individuals and/or entities, including Michael T. Moore, CPA; Northwest Savings Bank; Marquette Savings Bank; PNC Bank; and Schwindt Brothers. Plaintiff contends that this information is relevant in its effort to attempt to trace money or moneys which the defendant allegedly embezzled from the plaintiff over a significant period of time. Specifically, plaintiff contends that the scope of the subpoenas, 1993 through 2005, is reasonable in that it is necessary to take a snapshot of the defendant's economic picture prior to his involvement with Zem Zem, during his involvement with Zem Zem, and subsequent to his involvement with Zem Zem, in a further effort to trace the allegedly ill-gotten proceeds.

After careful consideration, the court is of the opinion that pursuant to Federal Rule of Civil Procedure 26(b)(1), that the type of information sought here is relevant to the claim of the plaintiff and, in my view, is subject to no applicable privilege. That said, in ordering the production, let me also say this. With respect to the time period, not only as to the substance of the subpoenas, but with respect to

the time period of the subpoenas, I'm of the opinion that they are not overly broad and that the financial picture of the defendant immediately before and immediately subsequent to his employment with the plaintiff is relevant and potentially calculated to lead to the discovery of other admissible evidence.

That said, given the fact that a number of documents that are requested would involve joint accounts with his wife and joint tax returns and beyond that, given the sensitive nature of the information in general, the court in denying the motion to quash directs the plaintiff that the information that is produced is to be maintained only by plaintiff's counsel and is to be shared with no third party. Now, when I say plaintiff's counsel, it also, of course, includes associates that would be working on it and that type of thing.

MR. LANZILLO: Your Honor, I trust that would also include any experts?

THE COURT: Forensic auditors?

MR. LANZILLO: Right.

THE COURT: Yes, but that's it. But I also want you to prepare -- well, strike that.

MR. LANZILLO: Your Honor, if I may, I may be able to help. I have a standard stipulated protective order, the basic elements of which --

THE COURT: I think you should submit that for my

signature. Anyone, like your expert, who would be getting a copy of this, I want him or her to get a copy of this protective order so they understand perfectly well that any limitations that are imposed on you, are equally imposed on them.

MR. LANZILLO: In fact, your Honor, as I recall the order, it has an acknowledgment that it's required that it be signed by any third-party expert who might be receiving confidential documents or information acknowledging in writing that they are aware of the restrictions placed on them by the order.

THE COURT: All right, let's go off the record here for a second.

(Discussion held off the record.)

(Whereupon, at 9:26 a.m., the proceedings were concluded.)

- - -

C E R T I F I C A T E

I, Ronald J. Bench, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Ronald J. Bench